**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

ALPHANETTE WATERS,

    Plaintiff,

v.                                                Case No. 3:13-cv-1013-J-32JBT

WAYNE CHISM,

    Defendant.

## O R D E R

This case asks whether Defendant Wayne Chism hung a loop of electrical wire from a truss and, if so, whether he intended it to be a noose used to racially harass Plaintiff Alphanette Waters.

Waters, an African-American building inspector, alleges that Chism, a building contractor, racially discriminated against her in violation of 42 U.S.C. § 1981. (Doc. 5). Chism moved for summary judgment (Doc. 14), Waters responded (Doc. 19, 23), Chism filed a reply (Doc. 31), and Waters filed a surreply (Doc. 35).[1] The Court heard oral argument on February 9, 2015, and the record of that proceeding is incorporated herein.

---

[1] Chism has since moved to exclude the testimony of Dr. Harry Krop. (Doc. 36). Waters responded to the motion (Doc. 42), and Chism filed a reply (Doc. 45). As Dr. Krop's testimony is not a part of the summary judgment record, the Court need not rule on the testimony's admissibility at this time.

**I.    FACTS**

In ruling on this motion for summary judgment, the Court views the facts in a light most favorable to Waters, the non-moving party, and draws all reasonable inferences in her favor. See Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014).

In 2004, Waters became a building inspector for Nassau County's Building Department. (Doc. 14-1 at 7).[2] Since at least June 2013, she has been the only female and only African-American inspector in the Building Department. (Doc. 23-4 at 5; Doc. 23-5 at 18).

Waters first began to have problems with Chism in May 2012 at a Chism development on Egans Bluff Road. (Doc. 14-1 at 63). Waters went to the job site and discovered kitchen appliances on the front lawn. (Doc. 14-1 at 66). Because Chism did not have a permit to remodel the kitchen, Waters had her office place a stop work order on the job. (Doc. 23-2 at 17). Chism and Waters had "a confrontation" about the issue and Chism's argumentative tone led Waters to believe he was angry. (Doc. 23-2 at 17). Ultimately, Chism resolved the problem by upgrading his scope of work to include the kitchen remodeling. (Doc. 23-2 at 17).

In October 2012, Waters inspected and failed Chism's own house in Marsh Creek. (Doc. 14-1 at 72, 75). Chism was angry, and, without making the necessary corrections, called the Building Department to say that the house was fixed and ready

---

[2] Page numbers in record citations refer to the page number in the docket, not to the page number of the deposition.

for inspection. (Doc. 23-2 at 22). Waters then had to ask her supervisor to go to the site and instruct Chism to make the necessary corrections. (Doc. 23-2 at 22).

Around that same time, Waters inspected a Chism home on Miner Road and noted a number of code violations. (Doc. 23-2 at 22-23). As a result of disagreements regarding the attic storage area, Chism requested the county provide him with every framing inspection ticket that Waters did in the previous year. (Doc. 23-12 at 21). He also asked Waters' supervisor at the time, Robert McKinney, to ensure that she would not inspect any of his projects. (Doc. 23-11 at 14). McKinney tried to accommodate this request, although Waters still inspected Chism's projects from time to time. (Doc. 14-7 at 10).

On Tuesday, June 18, 2013, Waters was assigned to perform a framing inspection on a Chism property located on Southern Lily Drive. (Doc. 14-1 at 24). While Waters was performing her inspection, her new supervisor, Jim Hare, stopped by and commented that a truss looked like it was going to roll. (Doc. 14-1 at 41). Chism said he would take care of the problem. (Doc. 14-1 at 41). Hare left shortly thereafter. (Doc. 14-1 at 26). Waters continued her inspection, noting seven or eight violations, and asked Chism if he was "okay with" the list. (Doc. 14-1 at 25). Chism said he was. (Doc. 14-1 at 25).

When Waters prepared to inspect the trusses, Chism became agitated. (Doc. 14-1 at 41). He admitted that the truss Hare pointed out might not match the drawings, but suggested that the truss worked nonetheless. (Doc. 14-1 at 26). Waters told Chism that he would need to get engineering revisions if the building did not match the

drawings. (Doc. 14-1 at 26). Waters said that Chism "kind of got in [her] space," trying to look at the plans in her hand, and they tried to figure out why the truss did not match the drawings. (Doc. 14-1 at 27). Chism requested permission to insulate the home, but, because insulation would cover up the problem with the truss, Waters told him not to insulate until he fixed the truss. (Doc. 14-1 at 27). Chism asked Waters to come back the next day to re-inspect the property so that he could remain on track to insulate on the 20th. (Doc. 14-1 at 27).

On Wednesday afternoon, June 19, Waters called Chism to let him know that, as promised, she would be coming to the Southern Lily Drive property before the end of the day. (Doc. 14-1 at 29). Chism told Waters that the requisite documents were in the documents box and that he had "that truss fixed up real nice for" Waters. (Doc. 14-1 at 30). While Waters thought Chism's comments were strange, she continued to the house for the inspection. (Doc. 14-1 at 52-53).

When Waters arrived at the home, she retrieved the plans from the document box, but found that they were dirty, crumpled, not stamped, not approved, and not the plans she had the day before. (Doc. 14-1 at 32). Upon walking into the house, Waters saw yellow Romex wire hanging from the ceiling joist on the same truss that needed to be fixed the day before. (Doc. 14-1 at 33). Romex wire is common in building construction. (Doc. 14-1 at 34). However, Waters took this wire, which had a loop at the end, to be a noose. (Doc. 14-1 at 33). Frightened, she ran out of the house. (Doc. 14-1 at 34).

## II. DISCUSSION

Chism argues that he is entitled to summary judgment because he did not discriminate against Waters and, even if he did, such discrimination did not rise to the level of creating a hostile work environment. (Doc. 14 at 15-20, 23-24). To establish a race-based claim for a hostile work environment, Waters must prove that (1) she is a member of a protected class, (2) she was subjected to unwelcome harassment, (3) that the harassment was based on race, (4) that the harassment was "severe or pervasive enough to alter the terms and conditions of [her] employment and create a discriminatorily abusive working environment", and (5) that Chism is responsible for the environment. Adams v. Austal, U.S.A., L.L.C., 754 F.3d 1240, 1248-49 (11th Cir. 2014).[3] "Only conduct that is 'based on' a protected category, such as race, may be considered in a hostile work environment analysis." Jones v. UPS Ground Freight, 683 F.3d 1283, 1297 (11th Cir. 2012). In determining whether behavior is based on race, a court must carefully consider the social context in which the behavior occurs. Id.

Chism has never said anything racially derogatory to Waters, nor has he ever touched her. (Doc. 14-1 at 81-82). At oral argument, Waters' counsel stated that Waters suffered three types of racial harassment which form the basis of her claim.

---

[3] Typically, a hostile work environment claim is brought against an employer by an employee. While Chism was not Waters' employer, he does not contest at this stage of the litigation that, like an employer, he can be held liable for creating a hostile work environment vis-à-vis Waters. (Doc. 14 at 23 n.11); Cf. Martinez v. Pavex Corp., 422 F. Supp. 2d 1284, 1291 n.7 (M.D. Fla. 2006) ("§ 1981's protection is broad enough to protect a non-employee subjected to a hostile work environment [by] a non-employer defendant, even though the parties do not have a direct employment relationship."). While this is a serious issue, because Chism did not raise the argument in his summary judgment motion, the Court will not further address it.

First, Chism's "representative" allegedly told Waters that Chism does not want to be told what to do by a black woman. Second, Chism allegedly questioned Waters' qualifications and requested her personnel file. Third, Chism allegedly hung a noose at the Southern Lily Drive home to threaten Waters.

Waters testified that, while she was at the Egans Bluff property in May 2012, over a year before the alleged noose incident, she spoke to two male "field staff members," one named Tony and one whose name she does not know. (Doc. 14-1 at 64). The men allegedly said to Waters that Chism "don't want you telling him what to do. You're a woman, and especially a black woman." (Doc. 14-1 at 65-66). Waters contends this evidence is not hearsay because it was a statement made by the opposing party's agent or employee on a matter within the scope of that relationship while it existed. (Doc. 19 at 13); see Fed. R. Evid. 801(d)(2)(D). At oral argument, Waters' counsel confirmed that they have not identified the individuals who allegedly made this statement; thus, they will not be witnesses at trial. As such, the only evidence of their alleged statement comes from Waters, who testified that she knows that the two men work for Chism "because they interacted with [her] on [Chism's] other inspections." (Doc. 14-1 at 65). However, Chism testified that his only employee is Cynthia Collins. (Doc. 14-2 at 7). Waters' bare assertion that the men work for Chism is insufficient to show that they are agents or employees of Chism whose statement was made on a matter within the scope of their relationship with Chism.

Inadmissible hearsay cannot be considered on a motion for summary judgment unless it can be reduced to an admissible form at trial. See Jones, 683 F.3d at 1293-

6

94. Waters has not shown any basis for admitting this evidence. As such, the Court cannot consider the alleged statement in ruling on the motion for summary judgment.

The second type of harassment that Waters allegedly suffered is Chism's questioning of her credentials and request for her personnel file. Specifically, Waters asserts that Chism asked for her qualifications to inspect his jobs (Doc. 23-2 at 19), requested copies of a year's worth of her inspections (Doc. 23-12 at 21), requested that she not be assigned to his projects (Doc. 14-2 at 12), refused to comply with the code after her inspections (Doc. 23-2 at 22), and requested her personnel file (Doc. 14-1 at 55). Some of these accusations rely on hearsay. Moreover, while Waters may not have appreciated Chism's actions, there is nothing inherently discriminatory about them. Waters provides no evidence tying these actions to her race.[4] However, even assuming <u>arguendo</u> that Waters has presented competent evidence that the alleged acts occurred and were done because of her race, they are not sufficient on their own to support a hostile work environment claim.

To succeed on a hostile work environment claim, a plaintiff must do more than show that she suffered from racially motivated harassment, she must also

---

[4] Waters' evidence that these actions were race-based consists of the undisputed fact that Chism wanted a sign supporting President Obama to be taken down because he thought it was too big under local ordinances (Doc. 23-2 at 21; Doc. 23-12 at 19), that he had used the "N-word" in the past (though not directed toward Ms. Waters or in her presence) (Doc. 23-12 at 21), and her contention that Chism did not treat white inspectors like he treated her. For example, Waters stated that Chism had never requested any of the white inspector's inspections records. (Doc. 23-3 at 14). However, her only basis for this belief is that she thinks she would have heard about such a request because her office is small. (Doc. 23-3 at 14). Chism testified that he requested the inspection records of Sprague Owings, a white inspector. (Doc. 23-12 at 21-22).

demonstrate that the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment and create a discriminatorily abusive working environment. Adams, 754 F.3d at 1248-49. The plaintiff's work environment must be both subjectively and objectively hostile. Id. at 1249.[5] Whether a work environment is objectively hostile is determined from the standpoint of a reasonable person in the plaintiff's position, knowing what the plaintiff knew. Id. at 1250. The relevant factors are the frequency and severity of the conduct, whether the conduct was physically threatening or humiliating or only an offensive utterance, and whether the conduct unreasonably interfered with the employee's job performance. Id. at 1250-51. Even if Chism questioned Waters' qualifications, asked for her not to be assigned to his projects, and requested her personnel file, and did so because of her race, those actions alone are not, as a matter of law, sufficiently severe or pervasive to constitute a hostile work environment. See id. at 1254.

The final alleged type of harassment, and the heart of Waters' case, is her allegation that Chism hung Romex wire in a loop at the Southern Lily Drive home to represent a noose and scare or intimidate her. (Doc. 14-1 at 43). There was a long piece of Romex wire with a loop on the end hanging in the Southern Lily Drive home when Waters entered it on June 19, 2013. (Doc. 14-1 at 33). While the loop was not made using a hangman's knot, its position hanging from the ceiling resembles a noose.[6] The

---

[5] The parties do not contest that Waters subjectively viewed her workplace to be hostile.

[6] A picture of the loop is attached as Exhibit A.

parties disagree as to where the loop came from. Waters accuses Chism of putting the loop there as a noose to frighten her. (Doc. 19 at 3). Chism contends that electricians used the loop as a tool and left it at the home. (Doc. 14 at 8).

Brian Knicley and Darren Cooner from Johnny's Electric wired the Southern Lily Drive home. (Doc. 23-10 at 6). Waters admits that, in wiring a home, Johnny's Electric sometimes uses loops similar to the one she found. (Doc. 23-2 at 13). In fact, Johnny's Electric hung at least three or four of those loops in the Southern Lily Drive house. (Doc. 23-10 at 21). The loop at issue had wear marks, indicating that something had been hung from it. (Doc. 35-2 at 64).

Knicley testified that the loop in question was Johnny's Electric's and that either he or Cooner put it where Waters found it. (Doc. 23-9 at 8). Indeed, he remembers that he and Cooner used a loop in the exact location where Waters discovered the loop. (Doc. 23-9 at 9). Knicley does not remember if he hung the wire (Doc. 23-9 at 8), and in fact does not believe that he did (Doc. 23-9 at 9). But he has no doubt that the wire was Johnny's Electric's. (Doc. 23-9 at 12). Cooner testified that, while he cannot say for sure whether the loop at issue is something he made, he thinks it is. (Doc. 23-10 at 20). Despite Knicley's testimony that Johnny's Electric had hung a loop in the exact spot where she found it, Waters argues that electricians only use loops in garages and therefore could not have hung the loop on the truss. (Doc. 23-2 at 14).[7]

---

[7] Cooner believed that the only Romex loop left at the home was in the garage. (Doc. 23-10 at 18). However, he indicated that loops could and were hung in places outside the garage. (Doc. 23-10 at 21). Knicley remembered using the loop in that

9

Waters also contends that the timing indicates that Cooner and Knicley could not have hung the loop. Waters completed the electrical inspection on June 14, 2013. (Doc. 23-7 at 1). Cooner testified that Johnny's Electric did not come back out to the property for at least a week after the passed inspection. (Doc. 23-10 at 15).[8] Although Waters did not get a chance to "find where the truss was, how [it was] supposed to be braced" or see what it looked like when she performed the framing inspection on the 18th, (Doc. 23-2 at 1), she is sure that the loop was not there then. (Doc. 23-2 at 2).[9] When Waters arrived on the 19th, however, the loop was there. (Doc. 14-1 at 33). As the electricians had not been to the house in between her framing inspection on the 18th and the discovery of the loop on the 19th, Waters asserts that they could not have hung the loop and that Chism must have done it. (Doc. 23-2 at 2, 12).

While Chism acknowledges being on the property on the morning of the 19th (Doc. 23-12 at 12), he testified that he had nothing to do with the loop or its placement as he did not hang it or instruct anyone else to hang it. (Doc. 14-3 at 3). Waters did not see Chism hang the loop and neither Chism nor anyone else ever told her that Chism hung the loop. (Doc. 23-2 at 2). Moreover, a number of people had access to the house between the time Waters left on the 18th and arrived on the 19th as Chism contacted

---

location. (Doc. 23-9 at 9).

[8] While Waters presented timesheets from Johnny's Electric to support this testimony, she excluded the timesheet for the relevant date, June 19th, 2013. (Doc. 35-1). Nevertheless, at oral argument, the parties agreed that the electricians did not go to the house between June 14th and the discovery of the loop on June 19th.

[9] Chism could not remember whether the loop was there on the 18th. (Doc. 23-12 at 18). Hare is likewise unsure about whether there was a loop there on the 18th. (Doc. 23-4 at 11).

10

subcontractors on the 18th and told them they needed to come to the site and fix the issues Waters noted before 8:00 a.m. on the 19th. (Doc. 23-12 at 11).

To rebut Chism's direct testimony that he had nothing to do with the loop, Waters points to her conversation with Chism on the 19th about the truss on which she found the loop. (Doc. 19 at 10). When Waters called Chism to tell him she would be coming to inspect his property that day as planned, his response was that he had fixed the truss up "real nice" for her, which Waters thought "was weird" and "sounded funny." [10] (Doc. 14-1 at 30). She then discovered the loop "in the exact location that Jim Hare pointed out" where the truss looked like it was going to roll. (Doc. 23-2 at 13).

Waters argues that had Chism not hung the loop, he would not have told Waters he left documents for her and fixed the truss because Waters asserts he did neither. (Doc. 19 at 10). However, Waters admits that she found documents in the document box on the 19th; she only states that they were dirty, unstamped, and different from the documents the day before. (Doc. 14-1 at 32). As for whether Chism fixed the truss, it is undisputed that, after Waters left the site on the 18th, Chism called the necessary subcontractors to take care of all issues she had noted. (Doc. 23-12 at 11). Chism called his truss manufacturer and framing contractor and told them that he needed them to

---

[10] In her initial account of the day in question, Waters indicated that Chism said he "had that truss fixed up for" Waters, omitting "real nice." (Doc. 14-1 at 101). However, in her deposition, Waters was adamant that Chism had said "real nice" and emphasized that his usage of the words "real nice" made the statement threatening. (Doc. 14-1 at 52).

11

fix all problems by 8:00 a.m. the following morning. (Doc. 23-12 at 11).[11] Waters acknowledged that blocking was added to the truss between the 18th and 19th. (Doc. 23-1 at 17). However, she testified that she did not look at the blocks as an attempt to fix the truss because she had never seen a truss blocked that way in the middle of a room. (Doc. 23-1 at 16-17).

Chism's statement that he had fixed the truss up "real nice," along with the history of disagreements between Waters and Chism constitute Waters' only evidence that Chism hung the loop. Waters admitted that the only personal knowledge she has about who hung the loop "is that Mr. Chism said, 'I got that truss fixed up for you real nice.'" (Doc. 23-2 at 2). Asked if she had any other basis for her belief, Waters added, "The other basis that I have is the history that I've gone through with him being mad when I fail his inspections. Any little thing that I try to do or I cite for him, he gets angry about it. He's complained about me to my supervisor. My supervisor has gone out there to say, 'She's right.' You know, he just got mad." (Doc. 23-2 at 4). Waters later elaborated on her history with Chism by noting that Chism "said [she] wasn't qualified to do his jobs," "pulled [her] personnel file," and "told human resources he didn't want [her] to check his jobs." (Doc. 23-2 at 9). During the failed inspection on the 18th and their phone call on the 19th, Waters could tell Chism was angry because she could feel "his energy." (Doc. 23-2 at 4).

---

[11] Neither party brought forward testimony from the subcontractors as to their work on the morning of the 19th or whether one of them could have possibly hung the loop or seen it.

12

Interrelated with the question of whether Chism hung the loop is whether the loop is a noose at all. Social context is important in determining whether behavior was racist. See Jones, 683 F.3d at 1297. Here, the context shows that the loop was an electrician's tool commonly seen on building sites, not a noose. The electricians were unequivocal in testifying that the loop looked like a tool they would hang. (Doc. 23-9 at 8; Doc. 23-10 at 16). Hare agreed that such a loop is often seen on construction sites. (Doc. 14-5 at 8). The police officer who responded to Waters' 911 call about the loop, Shawn Mortimer, is a former master electrician and recognized the loop as an electrician's tool. (Doc. 14-4 at 13). Chism testified that he saw multiple similar loops throughout the Southern Lily construction site. (Doc. 14-3 at 3). Even Waters acknowledges that Johnny's Electric sometimes uses a loop similar to the one she found. (Doc. 23-2 at 13). The only reason for Waters to believe that the loop was a noose was her belief that "real" loops only hung in the garage, that Chism said he had the truss from which the loop hung "fixed up real nice" and that Chism had been critical of her in the past.[12] This is a bridge too far.

In evaluating a motion for summary judgment, the Court must be careful to give the non-moving party the benefit of all reasonable inferences and not weigh conflicting evidence. However, a plaintiff cannot defeat summary judgment by relying on speculation or conjecture. See Paylor v. Hartford Fire Ins. Co., 748 F.3d 1117, 1122 (11th Cir. 2014) (noting that, to defeat summary judgment, a plaintiff must offer "more

---

[12] This, among other things, distinguishes this case from others involving nooses. See, e.g., Adams, 754 F.3d at 1251-53; Vance v. S. Bell Tel. & Tel. Co., 863 F.2d 1503, 1511 (11th Cir. 1989) (noose hung at employee's work station on two occasions).

than speculation or a mere scintilla of evidence"); Rodriguez v. Farrell, 280 F.3d 1341, 1352 n.20 (11th Cir. 2002) (finding no genuine issue of fact where the plaintiff presented only conjecture to contradict direct evidence). Ultimately, Waters relies too much on her own surmise; as a matter of law this is insufficient.[13] As Waters has failed to present evidence which would allow a reasonable jury to find that Chism hung the wire as a noose so as to racially harass Waters, she cannot rely on that alleged incident to create a triable issue of fact. See Beal v. Paramount Pictures Corp., 20 F.3d 454, 459 (11th Cir. 1994) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted.").[14]

## III. CONCLUSION

A noose is a powerful symbol of racial hatred. See McKenzie v. Citation Corp., LLC, No. CIV.A. 05-0138-CG-C, 2007 WL 1424555, at *13 (S.D. Ala. May 11, 2007). The Court does not question Waters' sincerity. She believes that the loop was meant to be a noose ("That's all I can see that as, is a noose. Being a black person, that's all I see.")[15] and that Chism placed it there to racially harass her. She has suffered emotionally because of the fear, anger, and anxiety this incident has caused her. But,

---

[13] Because Waters failed to present sufficient evidence to convince a reasonable jury that Chism hung the loop as a noose to racially harass her, the Court need not consider whether, if he had hung a noose as she alleged, such harassment would be sufficiently severe or pervasive. The Court does not rule out that it might well be.

[14] Chism raises a number of other challenges to the viability of Waters' hostile work environment claim, but the Court need not address them.

[15] (Doc. 23-3 at 13).

14

to prove her claim, Waters needs to have evidence beyond her own ipse dixit. Even viewing the evidence in the light most favorable to her and drawing every reasonable inference in her favor, no reasonable jury could find in Waters' favor on this issue. The rest of her case is based on inadmissible hearsay and the circumstance that Chism had a history of being critical of her work. That is not enough to create a triable hostile work environment claim.

Accordingly, it is hereby

**ORDERED:**

1. Defendant's Motion for Summary Judgment (Doc. 14) is **GRANTED**.

2. Defendant's Motion to Exclude Non-Disclosed Expert Witness (Doc. 36) is **MOOT**.

3. The Clerk should enter judgment in favor of Defendant Wayne Chism and against Plaintiff Alphanette Waters and close the file.

**DONE AND ORDERED** in Jacksonville, Florida the 31st day of March, 2015.

*[signature]*
TIMOTHY J. CORRIGAN
United States District Judge

w.

Attachments:
Exhibit A

Copies to:

Counsel of record